OPINION OF THE COURT
Betsy Barros, J.
The guardian herein has moved to judicially settle his final account and seeks an order that would approve all his schedules of assets and disbursements and income and grant his request for commissions, pursuant to SCPA 2307, and attorney’s fees for his lawyer.[1]
In a guardianship proceeding, when an application to judicially settle a final account is made, the clerks in the court’s guardianship department first review the final account, the entire file, as well as the report of the court-appointed counsel to review and endeavor to reconcile any outstanding questions prior to forwarding it to the court for approval.[2] In this particular matter, following said review, the clerks made some corrections to the accounting on their own.[3] However, the clerks found that the guardian’s final account required augmentation and *982 requested further explanation of the schedules submitted by the guardian, Michael N. Connors, Esq. In response, an associate in the guardian’s law firm provided supplemental information, and filed an amended final accounting. Still not satisfied, the clerk’s office brought to the court’s attention the following issues that yet needed to be addressed and resolved: (1) Was the newly formed revocable trust properly revoked? Had the guardian exceeded his authority when he revoked the trust? Had he acted improvidently in marshaling the trust assets into the guardianship account? (2) Was there possible overreaching and excessive fees taken by the guardian in the various fiduciary capacities? (3) Did the guardian act improperly by mislabeling the trustee commissions he took as court ordered, when they were in fact not court ordered?
This court reviewed the entire guardianship file as well as the Surrogate’s Court file, and because said reviews did not resolve the issues raised, a conference was held which was attended by the initial petitioner, by an associate of the guardian’s law firm, and by counsel to review. Following the conference, the court posed several pointed questions to the guardian and court-appointed counsel to review, and requested the submission of original documents as discussed more fully below herein.
Procedural History of the Case
Petitioner’s Position, Gravamen of the Petition, and Supporting Papers
On August 13, 2002, the petitioner filed an order to show cause and petition for the appointment of a Mental Hygiene Law article 81 guardian for Clara Joos (hereinafter Ms. Joos), a frail, wheelchair-bound 92-year-old woman, whose husband and whose only child had predeceased her. Her only blood relations, a niece and nephew, resided in Europe. The petitioner was Ms. Joos’ former son-in-law, John Lilley, who was divorced from Clara Joos’ only child. Despite the divorce, Mr. Lilley apparently remained close to Ms. Joos, having known her for more than 30 years. He had become concerned about her physical and financial well-being.
Mr. Lilley alleged that Ms. Joos had been financially exploited by a neighbor, Louise Weiss. According to the petition, Ms. Weiss *983 had discovered some $177,542.80 in bonds in Ms. Joos’ home, had taken her to a bank to cash said bonds, and then had retained $17,754.28 as a 10% “commission.” Mr. Lilley was alerted about these bonds and this “commission” not by Ms. Joos, but by Ms. Joos’ neighbor, Walter Schmand, and by a bank employee, Mr. Dank, both of whom found the transaction suspicious.
The petitioner further alleged that it was unsafe for Ms. Joos to remain alone in her home because the home’s run-down condition coupled with Ms. Joos’ frailty posed a chronic risk of injuries due to falls.
In March of 2002, Mr. Lilley, who had apparently been her attorney-in-fact,[4] concerned about her financial and physical safety, telephoned the law firm of Connors and Sullivan. According to the Lilley petition, this law firm had represented Ms. Joos for several years and had been working with Louise Weiss and her husband in managing Ms. Joos’ affairs.
Mr. Lilley alleged that during said telephone call he cautioned Connors and Sullivan that Ms. Joos could not remain safely alone in her home because she was at risk of falling unless she received 24-hour-a-day, 7-day-a-week home care. Arguing that he was not a blood relative, Connors and Sullivan would not provide him with information about Ms. Joos, even though they admitted that she had wanted Mr. Lilley to be her health care proxy. Mr. Lilley was never presented with the document despite his request for same. (See petition in support ¶ 4.)
The petition suggests that the failure of Connors and Sullivan to speak with Mr. Lilley amounted to a form of isolation of Ms. Joos and that his inability to obtain information about her forced him to file a guardianship petition.[5] Connors and Sullivan never explains its refusal to ask their client for permission to speak to Mr. Lilley, or to offer to meet Mr. Lilley in her home, or why the firm failed to present Mr. Lilley with a document appointing him as her health care proxy in accordance with her expressed wishes.
Mr. Lilley also alleged that Connors and Sullivan did not represent Ms. Joos with undivided loyalty. In the estate proceeding *984 of her daughter, Connors and Sullivan had sold her home for some $48,000 less than its assessed value.
Dr. James Lynch’s Report
Annexed to the petition was a report from Dr. James Lynch[6] dated May 21, 2002, which reflected his findings and diagnosis based on a psychiatric evaluation of Ms. Joos. The psychiatric evaluation was conducted on May 9, 2002 in her home. Both Mr. Lilley and her home attendant were present and interviewed. Dr. Lynch also conferred with Ms. Joos’ internist, Dr. John J. DeLuca.
On the mental status exam, Ms. Joos demonstrated significant impairments in the performance of simple calculations, and showed signs of visual and spatial disorientation. Her judgment and insight were limited by her cognitive losses, which included significant impairment of the long- and short-term memory.
Physically, Ms. Joos was frail, required 24-hour home care, and had fallen in her home several times, which required hospitalizations, and had, on one occasion, possibly suffered a transient ischemic attack.
With regard to her property, Ms. Joos knew she owned her home, received Social Security, and had savings, but did not know the amount of money she received from Social Security, the amount of money she had in savings, or in what form her assets were held.[7]
Dr. Lynch’s diagnosis was senile dementia of mild to moderate severity, most likely of the Alzheimer’s type, and he concluded that Ms. Joos was unable to advocate for herself and was vulnerable to financial exploitation. He also felt that she could not manage her personal needs without the intervention of others.
On September 3, 2002, the Honorable Muriel Hubsher signed the order to show cause, appointed a court evaluator pursuant to Mental Hygiene Law § 81.09, and ordered service on Ms. Joos, on the court evaluator, on the law firm of Connors and Sullivan, on Human Resources Administration’s Office of Reve *985 nue and Investigations, and on the Mental Hygiene Legal Service.
Affirmation in Opposition Filed on Behalf of Ms. Joos
No verified answer to the petition was interposed on behalf of Ms. Joos.[8] Instead, the law firm of Connors and Sullivan filed, not an affidavit by Ms. Joos, but an associate attorney’s affirmation in opposition to the petition. The affirmation is short, vague, and threadbare. The attorney affirmation alleged Connors and Sullivan had been representing Ms. Joos for the past 11 years, and that Ms. Joos had been cared for by Louise Weiss for many years. Louise Weiss provided transportation for Ms. Joos and had assisted her with activities of daily living, such as going to the supermarket, conducting banking transactions, appearing for doctor appointments, and had for the previous three years also been her health care proxy and attorney-in-fact.[9] (See affirmation of Connors and Sullivan associate, Oct. 10, 2002 [hereinafter referred to as affirmation], ¶ 3.)
According to the associate’s affirmation, in or around March 2002, Ms. Joos contacted Connors and Sullivan and expressed dissatisfaction with the way Louise Weiss was exercising the power of attorney by taking questionable gifts and establishing joint accounts with Ms. Joos and requested that Michael N. Connors of the law firm of Connors and Sullivan manage her finances and health care decisions. (See affirmation ¶ 4.) The affirmation does not mention Mr. Lilley’s telephone calls to Connors and Sullivan and his complaints about Ms. Weiss. Ms. Joos established a revocable trust, nominating Mr. Connors as trustee. Mr. Connors then placed Ms. Joos’ assets in a trust to protect said assets and to use them to pay Ms. Joos’ bills. On April 1, 2002, Ms. Joos executed a power of attorney appointing Michael N. Connors as her attorney-in-fact and his wife Elizabeth Connors as her successor attorney-in-fact. On the same date, Ms. Joos also executed a health care proxy nominating a Connors and Sullivan associate as her health care proxy and *986 Michael N. Connors as the alternate agent. (See affirmation ¶¶ 7-9.)
In the summer of 2002, Ms. Joos suffered a stroke, which the affirmation characterizes as minor and having had little impact on her health and memory because Ms. Joos could recognize people whom she saw regularly. (See affirmation ¶ 12.)
Connors and Sullivan charged Ms. Joos $600 a month for visits from a paralegal and for bill-paying services. The firm arranged 24-hour-a-day, 7-day-a-week home care through an agency. Mr. Connors, his wife and a number of other employees of his firm were monitoring her well-being and ensuring that her bills were paid.
The remainder of the affirmation asserts that a guardian is inappropriate because all of Ms. Joos’ pre-directives, i.e., the powers of attorney, the health care proxy, and the revocable trust, secured Ms. Joos in her property and person and therefore the appointment of a Mental Hygiene Law article 81 guardian would undermine Ms. Joos’ right to select her own fiduciaries. (See Mental Hygiene Law § 81.02 [a] [2].) The affirmation is silent about the following: the date the trust was established, the fees Ms. Joos paid for the trust, the estate savings envisioned by the creation of the trust, and the concomitant cost to Ms. Joos if the trust were revoked.
The Court Evaluator’s Report
The court evaluator submitted a seven-page report to the court with an annexed copy of the Clara Joos Revocable Trust (hereinafter trust), dated March 22, 2002, which appointed Michael Connors as trustee, a list of Ms. Joos’ trust and nontrust assets and cancelled checks signed by the trustee. According to the report, Ms. Joos was very comfortable in her home and received care from her attendant/companion, Elizabeth Jakuzko. (See court evaluator’s report, Oct. 21, 2002, at 2-3.)[10]
The court evaluator concurred that Ms. Joos was suffering from senile dementia and was permanently unable to manage her person and property, and noted that she had formed a significant bond with Michael N. Connors and members of his firm. The court evaluator made recommendations in the altérna *987 tive: that the court could appoint Michael N. Connors, Esq., as Ms. Joos’ guardian with a full array of property powers and personal powers, or that the revocable trust could continue and no guardian need be appointed. (See court evaluator’s report at 5-7.)
Ms. Joos’ Treating Doctor’s Affidavit
Per the affidavit of her internist, John J. DeLuca, M.D., Ms. Joos was confined to a wheelchair as a result of falls that caused multiple fractures. She needed a great deal of assistance in taking even a few steps, and excursions from her home entailed considerable and taxing effort. The affidavit was submitted in support of a home hearing to accommodate Ms. Joos’ multiple physical disabilities.
The Hearing and Settlement Negotiations
The hearing and settlement negotiations were held at the courthouse on two days, October 21, 2002 and December 4, 2002. The court evaluator’s report was entered into evidence. The brief testimony of Dr. Lynch, the only witness, revealed that Ms. Joos had suffered two strokes prior to the hearing dates. One stroke occurred in January 2002, some four months before Dr. Lynch examined her, and another stroke occurred in May 2002, a short time after Dr. Lynch’s visit. Mr. Connors, when discussing Ms. Joos’ strokes, stated that she had “[o]ne in May [sic] your Honor, which I notice has decreased her capacity.” (See transcript, Oct. 21, 2002, at 12, lines 24-25.)[11] As per the affirmation by Connors and Sullivan, Ms. Joos had suffered a third stroke in July, three months prior to the hearing.
During the limited colloquy between the court and Ms. Joos, the court asked her if she had wanted to give Ms. Weiss money after the latter’s discovery of some bonds in Ms. Joos’ home. Ms. Joos responded, “Don’t remember that. I don’t remember it too good, but it’s a while ago.” (See transcript, Oct. 21, 2002, at 12, lines 15-16.) The transfer had occurred just seven months earlier.
The hearing was not concluded, but rather cut short by a negotiated settlement wherein the objection to the guardianship was withdrawn on condition that there would be no finding of incapacity and that Michael N. Connors would be appointed *988 guardian of the person and property.[12] In her oral decision, Justice Hubsher granted Mr. Connors full powers as guardian and ordered that he consult with Ms. Joos’ doctor and with Mr. Lilley about decisions for Ms. Joos. The fees for the proceeding were to be borne by Ms. Joos. At the conclusion of the matter, Justice Hubsher requested updates on the matter and indicated that these updates could be by letter. (See transcript, Dec. 4, 2002, at 21, lines 16-21.) At no point during the pendency of the matter did Connors and Sullivan ever mention the estate savings to be generated by the trust or the detrimental financial consequences of undoing the trust. In the negotiated settlement, Connors and Sullivan never addressed the need for specific provisions to preserve the trust and insure its attendant financial benefits to Ms. Joos’ estate.
Post-Hearing Filings and Proceedings
The order and judgment was noticed for settlement by Connors and Sullivan, the firm in which Ms. Joos’ guardian, lawyer, trustee, executor, alternate health care proxy, and attorney-in-fact was a partner and in which her health care proxy was an employee.
The petitioner annexed a schedule of the assets to the settled order and judgment as per the request of a court clerk. The schedule of assets dated April 2, 2002 was the same schedule of assets attached to the court evaluator’s report. After the petitioner’s attorney, Ms. Reitano, received Connors and Sullivan’s notice of settlement, she wrote to the court to suggest that the guardian have jurisdiction over the revocable trust. Mr. Connors never responded to Ms. Reitano’s letter.
On January 31, 2003, Justice Hubsher signed the order and judgment, which granted the guardian property powers over Ms. Joos’ “property listed in Exhibit ‘A’ annexed thereto.” (See order and judgment at 3.) The asset schedule is typically included in the order and judgment appointing a guardian to provide guidance in setting the bond, and to inform the assigned court examiner of the nature, source, extent, and location of the ward’s assets.
The order and judgment was entered by the clerk on February 13, 2003 and, on July 10, 2003, some five months after entry *989 of the order and judgment, the guardian filed his bond and oath and designation. The guardian never obtained his commission.[13]
By notice of motion dated June 12, 2003, the petitioner, Mr. Lilley, moved for an order to be reimbursed $1,415 by Ms. Joos’ guardianship estate for his attorneys fee and court costs. The guardian’s law firm opposed the motion by written affirmation. On September 22, 2003, during oral argument, the court began to question whether it had erred in appointing Mr. Connors as guardian and made inquiry as to whether the estate plan he designed for Ms. Joos inappropriately benefitted himself or his law firm. The court directed Mr. Connors to file an affidavit to assuage its concerns that his extensive involvement with Ms. Joos in the months prior to the guardianship had been motivated solely by pecuniary self-interest and not by filial-like concern as claimed. (See entire transcript of oral argument, Sept. 22, 2003.)
On or about October 6, 2003, as per the court’s direction, Mr. Connors submitted an affirmation stating neither he nor anyone related or affiliated with him was a beneficiary of the trust. Despite being a court appointee, obligated to be transparent in answering the court’s concerns about his ward’s finances and estate planning, Mr. Connors failed to disabuse the court of its notion that the trust still existed. The court remained unaware of the financial rewards Mr. Connors and his law firm would reap from revocation of the trust in the form of executor commissions and legal fees in the Surrogate’s proceeding.
Ms. Joos passed away on December 31, 2003, and the guardian moved for judicial settlement of his final account.
The Court’s Concerns About the Guardian’s Actions
Given that a guardian must act with the utmost propriety toward his ward’s estate, this court asked the guardian’s lawyer and counsel to review to specifically respond to the following pointed questions: (1) Given the multiple roles played by the guardian in the life of Ms. Joos and the fees and commissions he has already taken as her attorney, as her trustee, and as her executor, what is counsel to review’s recommendation about awarding additional commissions to the guardian? (2) Was the trust revoked, and if so, under what authority? Did the trust allow for revocation by anyone other than Ms. Joos? (3) Was there *990 any advantage to revoking her trust? If the trust had been maintained would Ms. Joos’ estate have saved money by avoiding Surrogate’s Court? (4) What are the fees and commissions received, awarded, and requested by the guardian in his various fiduciary capacities?
This court requested that the guardian/trustee/executor provide it with the following original documents: the trust, the revocation of the trust, the health care proxy, and the power of attorney. Said original documents were never provided. The court has copies only of the trust and the revocation of trust— not originals.
The Guardian’s Responses to This Court’s Questions and Concerns
The court granted wide latitude to the guardian to amend or supplement his responses and filings. The guardian declined an opportunity for a hearing or oral argument on the matter, and the matter was marked on submission.
Revocation of the Trust and Actions Toward Trust Assets and Guardianship Obligations
The guardian maintained that Ms. Joos of her own volition had revoked her trust and provided the court with a copy of the purported revocation. Review of the transactions after the issuance of the order and judgment raised several concerns regarding the manner in which the guardian/trustee executed his obligations.
The trustee repeatedly disregarded the strict formalities required in the administration of a trust. For example, the acknowledgment of the revocation originally dated March 28, 2003 was crossed out to read February 18, 2003. Improperly, the trustee/guardian withdrew trust assets on February 13, 2003 and February 16, 2003, that is, before February 18, 2003, the date the revocation document is signed and acknowledged. The trustee/guardian on February 6, 2003, paid himself $12,431.89 in trustee commissions, well before either the trust’s one-year anniversary which would have been March 22, 2003, or the date the trust was purportedly revoked February 18, 2003. Taking exiting trustee commissions before the revocation of a trust is improper and taking annual commissions before the anniversary of the trust is also improper. In addition to the commissions as trustee, the trust paid the trustee’s law firm $600 per month to pay Ms. Joos’ bills and to supervise her agency-provided home care. Any portion of the $600 per month al *991 located to bill paying services appears to be double billing.[14] Moreover, the trustee/guardian’s assertion that the trust was revoked is belied by the fact that Ms. Joos’ house remained a trust asset until it was sold by Mr. Connors in his capacity as trustee/executor approximately a year after her death.
Mr. Connors likewise disregarded requirements contained in the order and judgment appointing him guardian. For instance, Mr. Connors marshaled all of Ms. Joos’ liquid assets into a guardianship account(s) several months prior to obtaining his bond and without ever receiving his commission to act.
The guardian’s counsel admits that, had the trust not been revoked, Ms. Joos’ estate would have avoided nearly all of the $74,000 in executor’s commissions and legal fees in the probate proceeding. The acknowledged estate plan was to have the trust hold nearly all her assets, leaving only a small estate for probate. (See affirmation in support of attorney fees and full statutory commissions, July 1, 2008, ¶¶ 31-32.)
Of greatest concern to the court is that Ms. Joos’ attorney/ guardian[15] never attempted to prevent the estate planning fiasco that occurred when the trust was revoked, and in fact began to undo his client’s estate plan even before the trust revocation was signed. Despite the consequences of his failure to preserve the trust, Mr. Connors still maintains he is entitled to full guardian commissions, as well as legal fees for his final account.
Guardian’s Justification for Revocation of the Trust
The guardian has advanced two arguments to justify the revocation of the trust: first, that the guardianship court declared Ms. Joos in need of assistance, and never deemed her incapacitated; therefore she was free to revoke her trust and should be allowed to do with her assets as she wishes; and second, that the order and judgment directed the revocation of the trust. Neither argument is persuasive.
The Guardian’s Argument That Ms. Joos Freely and Voluntarily Revoked Her Own Trust
Any contention by the guardian that Ms. Joos made an independent, knowing, and informed decision to revoke her trust *992 is incredible. When the trust was revoked, Ms. Joos was in the final months of her life and utterly dependent on others, most especially Mr. Connors, a person who had established multiple fiduciary relationships with her. There is sufficient support in the record to conclude that Ms. Joos neither sought to revoke the trust, nor had the requisite understanding of the financial consequences triggered by executing the revocation.
Assuming Ms. Joos had wanted to revoke her trust, the guardian’s argument that he was powerless to prevent the revocation is disingenuous. Under the explicit provisions of the trust, the trustee is vested with the authority to retain a psychiatrist to evaluate whether the grantor is competent to revoke the trust. (See trust, Mar. 21, 2002, cl 7 [c], at 6.) Mr. Connors could have easily relied on Dr. Lynch’s finding of senile dementia. Under such circumstances, Mr. Connors, as Ms. Joos’ trustee, would have been obligated to question her capacity and challenge a decision so adverse to her self-interest.
The Guardian’s Argument That the Order and Judgment Compelled Trust Revocation
The guardian maintains that the trust revocation was compelled by the order and judgment. In support of this argument, the guardian points to the language in the order and judgment granting him as guardian, “[t]he power to manage the property and financial affairs, including but not limited to the property listed in exhibit ‘A’ annexed hereto,”[16] and further relies on the fact that the bond amount set by the court equals Ms. Joos’ trust and nontrust liquid assets.
The guardian’s contention that the order and judgment required revocation of the trust is baseless. The order and judgment neither explicitly orders Ms. Joos to revoke her trust nor does it invalidate the trust.
Moreover, the record clearly demonstrates that Justice Hubsher never countenanced the revocation of the trust with its attendant windfall to the guardian and financial detriment to the ward. Nor did she view the existence of a trust and guardianship as mutually exclusive. In fact, during the hearing she described guardianship as a protection “beyond just the trust and beyond the position as a lawyer.” (See transcript, Oct. 12, 2002, at 13, lines 17-23.) On September 22, 2003, some seven months after the trust revocation, Justice Hubsher directly asked an associate of Connors and Sullivan on the record, “What *993 is the amount of money she has in that revokable [sic] trust?” (See transcript, Sept. 22, 2003, at 7, lines 8-9.) Clearly the court’s inquiry about the trust corpus presupposes the trust’s existence. The associate, rather than inform Justice Hubsher that the trust has been revoked, leaves the question unanswered and responds that the question is immaterial. (See transcript, Sept. 22, 2003, at 7, lines 10-14.)
Assuming that the guardian interpreted the order and judgment as directing revocation of the trust begs the question: Why did this guardian, an expert in estate planning, passively follow a questionable interpretation of the order and judgment that would cost his ward tens of thousands of dollars?
The guardian cannot credibly argue he had no choice but to passively follow the court’s direction. The record reflects that the guardian is a capable advocate, unafraid to challenge the court or his adversaries. The guardian was free to make a motion for reargument or appeal the order and judgment. A simple request by Mr. Connors to conference the matter to explain why the trust should be preserved would have undoubtedly resulted in estate savings of tens of thousands of dollars.[17]
Fees and Commissions Incurred by the Estate
The guardian never tabulated the exact expenses incurred as a result of the trust revocation, but from the documents submitted to the court, executor commissions combined with legal fees to Mr. Connors and his firm are in excess of $74,000.
In less than a year, the trust generated a $12,431.89 commission, and $10,900 in legal and bookkeeping fees.
Mr. Connors now seeks an additional $22,327.50 in guardianship commissions calculated under SCPA 2307, and legal fees to his firm of $5,072 for its representation of him in his final accounting.
Standard for the Award of Commissions
Pursuant to the order and judgment, “the compensation of the Guardian shall be fixed by the Court in accordance to the services actually rendered pursuant to MHL 81.28.” (See order and judgment, Jan. 31, 2003.)
Mental Hygiene Law § 81.28 refers to no specific formula to calculate compensation and never uses the term commissions:
“§81.28 Compensation of guardian
*994 “(a) The court shall establish, and may from time to time modify, a plan for the reasonable compensation of the guardian or guardians. The plan for compensation of such guardian must take into account the specific authority of the guardian or guardians to provide for the personal needs and/or property management for the incapacitated person, and the services provided to the incapacitated person by such guardian.”
It has been held that under Mental Hygiene Law § 81.28, the court is to use its discretion to award compensation to guardians: “it is clear that the compensation of guardians must be determined case by case, based upon the responsibilities of the guardian, the nature and extent of the assets and the anticipated duration of the guardianship.” (Matter of Sehr, 169 Misc 2d 543, 546 [1996].) Moreover, the specific language of the statute leaves to the court’s discretion the formulation of a compensation plan for an article 81 guardian. (See id.)
Courts have typically looked to SCPA 2309 to calculate compensation when the guardian has acted like a trustee, and to SCPA 2307 to calculate compensation when the guardian has acted like an executor or an administrator. (Sehr, supra.)
The award of compensation is not a given. Compensation is awarded for services rendered and the benefit the ward received. If the court finds that the guardian has failed to satisfactorily discharge his duties, the court may in its discretion reduce or deny compensation to the guardian.
“§81.28 Compensation of guardian . . .
“(b) If the court finds that the guardian has failed to discharge his or her duties satisfactorily in any respect, the court may deny or reduce the compensation which would otherwise be allowed.” (Mental Hygiene Law § 81.28 [b].)
A guardian’s duty to his ward is that of a fiduciary. As a fiduciary, the guardian must exercise the utmost fidelity in dealing with his ward’s person and property. The guardian is statutorily mandated to use the utmost loyalty in relation to his ward. (See Mental Hygiene Law § 81.20 [a] [6] [ii].) The inviolate standard of behavior to which a fiduciary must comply was most eloquently expressed by Chief Judge Benjamin Cardozo:
“A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has *995 developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the ‘disintegrating erosion’ of particular exceptions (Wendt v. Fischer, 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.” (Meinhard v Salmon, 249 NY 458, 464 [1928].)
Guardianship matters occupy a unique niche in civil litigation. The impaired ward’s dependence upon her fiduciary, a court appointee, requires this court to be vigilant that there be no disintegrating erosion in the standard of undivided loyalty and fidelity a guardian employs in his dealings with his ward’s person and property. The relationship herein was one marked by susceptibility to allegations of excessive billing, failure to pursue remedies,[18] failure to preserve the ward’s estate, and apparent conflicts of interest with no proffering of proof that Ms. Joos waived the conflicts of interest.[19] This court cannot avoid the conclusion that the guardian herein failed to operate under the applicable standard and failed, to this court’s satisfaction, to adequately discharge his duty as guardian.
The guardian has asserted that this court must grant him full commissions because no one has filed objections to his request for commissions. While it is true that no distributee under Ms. Joos’ will or trust has objected to the guardian’s request for commissions, this court is not a rubber stamp mechanically approving the computation of commissions based upon SCPA 2307 or any other statute regardless of the guardian’s performance of *996 his duties.[20] Mental Hygiene Law § 81.28 requires this court to use its sound discretion given the totality of the circumstances when awarding commissions.
Receipt of full statutory commissions in each of several fiduciary capacities may be justified in some circumstances. In this case, however, the guardian’s voluntary actions created a situation where the fiduciary commissions he asks this court to award would result in a windfall to him at the direct dollar for dollar expense of his ward’s estate. This court will not award further compensation for such machinations.
Guidance in Commissions from the Best Practices Publications
The Appellate Division for the Second Department has provided guidance for trial courts in awarding commissions. “Where a Guardianship involves substantial assets and strict adherence to a statutory formula (be it either SCPA 2307or SCPA 2309) would result in a windfall to the Guardian, the compensation awarded should be commensurate with the services actually rendered.” (Supreme Court of State of New York, Appellate Division: Second Judicial Department, Best Practices: Guardianship Proceedings, at 5 [Apr. 1, 2005] [emphasis added], available at http://www.nycourts.gov/courts/ad2/pdf/ BestPracticesHandbook_l.pdf [accessed Apr. 20, 2009].)
Given the fact that the guardian has already obtained trustee fees of $12,431.89, estate planning and booking fees of approximately $10,900, obtained full executors’ commissions of $37,339.26,[21] and has requested some $36,000 in legal fees in the Surrogate’s Court, this court finds that any further commissions for the 10-month period that lapsed between the trust revocation and Ms. Joos’ death would be a windfall — the precise result that the best practices manual cautions should be avoided. In this matter, the guardian failed to preserve his ward’s assets, failed to preserve her trust, failed to file an initial report, filed his bond some five months after the order and judgment was entered, and failed to obtain his commission. When the windfall of executor commissions resulting from the guardian/trustee/ attorney’s failure to preserve his ward’s trust is coupled with the trustee commissions already obtained, this court finds that *997 yet a third commission to Mr. Connors would be an unjustified reward for his services as guardian.
An Award of Commissions under Quantum Meruit is Likewise Precluded
Any potential claim by Mr. Connors for compensation under quantum meruit as Ms. Joos’ uncommissioned guardian or as her “agent” is likewise unsubstantiated by the record. In light of his failings in his various fiduciary capacities, the commissions he has already received and may yet receive as executor more than amply compensate Mr. Connors for “managing” his ward’s agency-managed home care and paying her bills for 10 months.[22]
Lawyer’s Fees
The request for legal fees to the guardian’s counsel is also denied. The guardian is a lawyer and should not have to hire counsel to do his accounting as accounting is a duty that a guardian must discharge (see Matter of Osgood, 119 Misc 251 [1922]; Matter of Williams, 245 App Div 505 [1st Dept 1935]). The period of the accounting was less than a year and Mr. Connors, an experienced elder law attorney, should not have had to retain counsel to handle this matter. Moreover, what should have been a simple final accounting was complicated by Mr. Connors’ failure to be transparent and forthright in his accounting.
In Conclusion
This court has labored with the facts of this case. The attorney/guardian herein enmeshed himself in the affairs of his client and ward, blocked the attempts of a concerned former son-in-law from obtaining information, collected nearly every conceivable fee, and occupied so many fiduciary relationships that conflict of interest questions were inevitable. This court is keenly aware that guardianship and trustee commissions are often the price to be paid to protect vulnerable, isolated, and impaired people from exploitation during the period of their lives when they are easy prey to the unscrupulous, but that regrettable fact does not lessen the court’s statutory obligation to exercise its discretion and reduce or deny commissions if a guardian’s performance is unsatisfactory; it is hereby ordered, there will be no compensation to the guardian, and it is further *998 ordered, that there will be no legal fee to the guardian’s attorney; and it is further ordered that the final account of the guardian be and the same here is judicially settled and allowed in accordance with the following summary statement:
The guardian shall be charged with $654,701.51
As principal on hand (Schedule A)
Decrease to principal (Schedule B) ($ 231.36)
Subtotal $654,470.15
Income Received $ 18,571.20
Subtotal $673,041.35
Guardianship estate $571,155.70
Ordered, counsel to review shall be compensated in the amount of $4,000 for services rendered herein; and it is further ordered that the guardian shall, if not having already done so, turn over the balance of funds remaining to the estate of Clara Joos; and it is further ordered that upon the guardian’s complying with the provisions of this order and decision and filing proof thereof, he and the surety may be discharged as to all matters embraced in the account herein by an appropriate ex parte order.

. The guardian herein is a named partner in the law firm representing him in this action.

. This matter was reassigned from Justice Muriel Hubsher to this court in 2004. The guardianship clerk’s office completed its review of the final account in 2007.

. For instance, the guardian’s inclusion, as part of the guardianship estate, of the proceeds of the sale of the ward’s home after her death inflated *982 the calculation of commissions and the clerks recalculated the commissions without the inclusion of said proceeds. (Matter of Lindsay, 276 AD2d 451 [2000]; Matter of Merritt, 278 NY 74, 77 [1938]; Matter of Luka, 23 AD2d 46, 48 [1965].)

. A revocation of a power of attorney held by Mr. Lilley was filed by Connors and Sullivan on or about April 2, 2002. Mr. Lilley, however, in his petition does not indicate whether he was Ms. Joos’ power of attorney.

. Petitioner’s attorney informed Justice Hubsher, “He [Mr. Lilley] commenced the application by order to show cause based upon his inability to obtain any information regarding Ms. Joos” (see transcript, Sept. 22, 2003, at 3, lines 16-18).

. Dr. Lynch is and has been deemed an expert witness in adult psychiatry innumerable times in guardianship proceedings by this and other courts and has been board certified by the American Academy of Psychiatry and Neurology since 1996.

. At the time of the guardianship, Ms. Joos’ assets, excluding her real property, were in excess of $800,000, most of which were held in a trust.

. Proceedings under Mental Hygiene Law article 81 are special proceedings and the pleading requirements are governed by CPLR 402. The use of an order to show cause as an alternative to the notice of petition is allowed under CPLR 403 (d) and is mandated and codified in Mental Hygiene Law § 81.07 (b). A petition for a Mental Hygiene Law article 81 guardian properly requires a responsive pleading — an answer — which was not filed in this matter.

. The affirmation is silent about whether or not Ms Weiss’ services were gratis or were compensated, and how involved the law firm of Connors and Sullivan was in establishing and maintaining the relationship between Ms. Weiss and Ms. Joos.

. From the checks attached to the court evaluator’s report, the trust paid the Alcott Group $1,317.53 weekly. The Alcott Group is the agency that handled the human resources aspects of Ms. Jakuzko’s employment. Ms. Jakuzko received $800 per week for her services. The trust therefore was paying a $517.53 weekly premium to the agency, in part, for its oversight of the home care.

. This court takes judicial notice that although the transcript is dated October 2, 2002, the hearing was actually held on October 21, 2002.

. A finding of incapacity would have made the Connors and Sullivan estate plan, to wit: the three wills executed since Ms. Joos’ daughter’s death, the recently executed trust, powers of attorney and the health care proxy, as well as the selection of appointees and agents, and legal fees charged, susceptible to challenge on the ground that Ms. Joos was incapacitated at the time her estate plan was established.

. A search of the court file and a review of the county clerk’s minutes by this part revealed no commission and when chambers requested that the guardian produce a copy of a duly executed commission, a member of the law firm of Connors and Sullivan stated that the firm lacked a copy of a commission.

. Mr. Connors, in his October 6, 2003 affirmation, states that his firm was paid. $650 a month for bill paying services and supervising the professional home care.

. According to the report of counsel to review, on his firm’s Web site, Michael N. Connors, Esq., claims expertise in elder law and estate planning.

. Schedule A lists trust and nontrust assets.

. The guardian could have requested that the bond be denominated as a trustee/guardian bond, a common practice.

. For instance, no turnover proceeding was commenced against Ms. Weiss for the $17,000 she took from Ms. Joos, nor did the guardian ever demand from Ms. Weiss an accounting of her activities as attorney-in-fact.

. Code of Professional Responsibility DR 5-101 (a) (22 NYCRR 1200.20 [a]) states:
“Conflicts of interest; lawyers own interests.
“(a) A lawyer shall not accept or continue employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer’s own financial . . . interests, unless a disinterested lawyer would believe that the representation of the client will not be adversely affected thereby and the client consents to the representation after full disclosure of the implications of the lawyer’s interest.” (Emphasis added; see also Code of Professional Responsibility DR 5-102 [a] [22 NYCRR 1200.21 (a)] [Conflict of interest if a lawyer is to be a witness if a turnover proceeding had been brought against Ms. Weiss].)

. Mr. Connors failed to notice Ms. Joos’ heirs on the guardianship order and judgment. On his motion to settle the final account, Mr. Connors only served the petitioner’s attorney, and one other heir, Klara Seitz. Five heirs, three of which were charitable organizations, were not noticed on the motion to settle the final account.

. (See affirmation of counsel to review, Sept. 26, 2008, ¶ 9.)

. There is no affirmation of services by Mr. Connors recounting the hours of service he, and not an office employee, provided.